Robert L. McCORD, Appellant–Respondent,

v.

Angela E. McCORD, Appellee–Petitioner.

No. 15A01–0506–CV–239.

Court of Appeals of Indiana.

Aug. 9, 2006.

Joseph A. Colussi, Madison, IN, Attorney for Appellant.

Frank G. Kramer, Ewbank, Kramer & Dornette, Lawrenceburg, IN, Allison T. Frazier, Alcorn Goering & Sage, LLP, Madison, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Robert L. McCord appeals the trial court's order dissolving his marriage to Angela E. McCord and dividing the marital property.[1]

We reverse and remand with instructions.

### ISSUES

1. Whether the trial court erred in awarding Angela a judgment in the amount of $487.82.

2. Whether the trial court misinterpreted Robert and Angela's prenuptial agreement.

3. Whether the trial court erred in dividing the proceeds from the sale of the marital residence.

4. Whether the trial court erred in valuing an asset of the marriage.

### FACTS

Robert and Angela entered into a prenuptial agreement (the "Prenuptial Agreement") on January 15, 1998. The Prenuptial Agreement provided as follows:

> [T]he parties, mature adults who each have been previously married and have children from the previous marriages, desire to waive their respective rights to the property and estate of the other during their marriage and upon the ter-

---

1. We observe that Robert's brief fails to comply with Indiana Appellate Rule 46(A)(10), which requires an appellant's brief to "include any written opinion, memorandum of decision or finding of fact and conclusions thereon relating to the issues raised on appeal."

mination of their marriage by death or dissolution.

[E]ach party has fully disclosed to the other his or her financial condition, including the amount of assets, income, and liabilities, and each is satisfied that he or she, knows and understands the financial condition of the other and waives further disclosure.

[E]ach party agrees that Exhibits "A" and "B" attached to this prenuptial agreement set forth the descriptions, character, and fair market value of substantially all of their respective assets, liabilities and income.

[E]ach party recognizes that the property of the other may increase through earnings, appreciate [sic], further investments, inheritances, and the like and is entering into this prenuptial agreement regardless of the value of such additions.

[E]ach party knows and understands his or her rights in the property of the other to which he or she would be entitled by the reason of their marriage and its subsequent termination by death or dissolution in the absence of any agreement between them.

... Robert Leroy McCord has been represented by Joseph A. Colussi and Angela E. Bacon [sic] each party is aware of his or her right to consult independent legal counsel to be fully advised as to the nature and consequences of this prenuptial agreement. (App.15–16).

Exhibit "A" of the Prenuptial Agreement listed Robert's assets and their respective values, including, in relevant part, the following: 1) real estate located in Aurora, Indiana, valued at $106,000.00; 2) real estate located in Florence, Indiana, valued at $55,000.00; 3) a 1996 quad runner, valued at $5,000.00; 4) a 401(k) through Robert's current employer, North American Stainless, valued at $11,000.00; 5) a whole life insurance policy with a payout of $200.00 per month at age sixty-five; and 6) a "UIU Pension"[2] with a payout of $400.00 per month at age sixty-five. (App.18). Robert's only liability was a mortgage on his Aurora home in the amount of $94,000.00. Exhibit "B" listed Angela's assets, which consisted of a vehicle, furniture and money in a checking account, with a total value of $6,500.00.

Robert and Angela were married on January 26, 1998. Although Robert and Angela had children from previous relationships, no children were born to their marriage.

After the marriage, Angela began working at Cincinnati Bell, earning approximately $50,000.00 per year; Angela participated in Cincinnati Bell's savings and pension plans. Robert continued his employment at North American Stainless, earning a base salary of $32,000.00; with incentive programs, however, Robert earned over $50,000.00 in 2003 and $60,000.00 in 2004.

During the marriage, Robert sold his Aurora residence and his property in Florence, netting $28,000.00. Subsequently, Robert and Angela purchased a lot and built a home, which was titled in both of their names. Robert contributed the $28,000.00 from the sale of his real estate toward the purchase of the lot and construction costs; Angela contributed $13,000.00 she received from an inheritance toward the construction costs. They carried two mortgages on their residence, totaling $181,000.00.

Angela moved out of the home on January 15, 2004. After Angela moved out of the residence, Robert made the final six mortgage payments, totaling $7,200.00, be-

---

**2.** This pension was through a former employer.

fore the parties sold the residence for $228,000.00 in 2004. The sale of the marital residence netted $24,471.31, which the parties placed in a trust account pending the dissolution.

When the parties separated, Robert owned a 1997 Ford truck. In August of 2000, Angela and Robert entered into a five-year lease of a 2001 Nissan Pathfinder, which Angela kept after the parties' separation. Pursuant to the lease, the "Lessee may be charged for excessive wear based on Lessor's standards for normal use and for excess mileage at the rate of 12 cents . . . for each mile . . . in excess of 60,274 miles." (Ex. J). The Nissan had 274 miles on it on the date Angela and Robert entered into the lease. Thus, the Nissan could be driven no more than 60,000 miles during the lease's terms without incurring a mileage fee. Angela projected that by the end of the lease, the Nissan would have approximately 147,720 miles on it, thereby incurring a charge in the amount of $10,440.00. Angela and Robert could option to purchase the Nissan at the end of the lease's term for $15,459.38. Angela maintained exclusive possession of the Nissan after the parties separated.

At the time of the parties' separation, Robert's 401(k) had a value of $73,500.00, which included contributions made during the marriage and accumulated earnings. In 2001, Robert took out a loan in the amount of $5,000.00 against his 401(k). At the time of the final hearing, the loan balance was approximately $2,500.00.

On February 10, 2004, Robert filed a petition to dissolve the marriage. The trial court entered provisional orders, which divided the parties' personal property. The trial court held a final hearing on January 24, 2005. Angela requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52. On April 26, 2005, the trial court entered its findings of fact, conclusions of law and judgment. The trial court found the following:

5. During their marriage, the parties acquired real estate at 9570 Dockery Road, Aurora, Indiana (hereinafter the "marital home"). Title to the marital home was taken as follows: "Robert L. McCord and Angela E. McCord, husband and wife". The marital home is not the separate property of either party and is subject to division as a marital asset.

6. The marital home was sold in 2004 for $228,000.00 with distribution at closing as follows:

| | | |
|---|---|---|
| a. First Mortgage | $167,441.11 |
| b. Second Mortgage | 18,190.06 |
| c. Realtor Commission | 13,680.00 |
| d. Taxes | 4,093.52 |
| e. Miscellaneous | 124.00 |

7. Net proceeds of sale are in the sum of $24,471.31 which are being held in Mr. Colussi's trust account.

8. Additional marital assets at the time of final separation subject to division are as follows:

The Pre–Nuptial Agreement cannot be construed as setting off to each party all income earned during the marriage. Angela's income was direct deposited to Robert's checking account. Robert was employed at North American Stainless continuously from prior to the marriage until the final hearing. The balance in his 401(K) account at the time of marriage was $11,000.00 and is the separate property of Robert under terms of the Pre–Nuptial Agreement. Contributions were made to the plan during the marriage of $61,740,92, less loan of $2,500.00 for net increase in value of the plan of $59,240.92

| | | |
|---|---|---|
| Angela's Savings & Security Plan-Cincinnati Bell, Inc. | 10,471.02 | |
| Less loan balance | ( 2,924.63) | 7,546.39 |
| Angela's Cincinnati Bell Pension Plan | | 9,415.70 |
| Angela's ... Life Insurance Policy Cash Surrender Value | | 836.54 |
| Robert's ... Life Insurance Policy Cash Surrender Value | | 6,357.07 |
| 1997 Ford F250 Pick Up | | 10,526.00 |
| Robert's Checking Account ... As of February 5, 2004 | | 5,632.69 |
| Angela's Checking Account ... | | 400.00 |
| Total Marital Assets (other than marital home) | | $99,955.31 |

10. Marital debts consist of:

| | | |
|---|---|---|
| MBNA America Account ... | $ 8,297.87 | |
| Less Robert's shotgun | ( 1,100.00) | $7,197.87 |
| Capitol [sic] One Visa Account | 500.00 | |
| Deficiency on Nissan car lease per Respondent's Exhibit "K" | | 10,440.00 |
| Total Marital Debts (other than relating to marital home) | | $18,137.87 |
| Net Marital Estate subject to division (other than marital home) | | $81,817.44 |

11. Tangible items of personal property have been equitably divided.... Robert shall pay Angela the sum of $487.82 he received from Fifth Third Bank after the date of final separation in March 2004 from double car payment. Judgment is entered in favor of Angela and against Robert for said amount.

12. Robert is not entitled to credit for mortgage payments he made during the pendency of this cause since he had the use of the marital dwelling until it was sold. Angela is not entitled to credit for lease payments on the Nissan she made during the pendency of this cause since she had the use of said vehicle.

(App.5–6). The trial court then ordered that the $24,471.31 balance from the sale of the marital residence be applied as follows: 1) $10,440.00 to Fifth Third Bank to pay the deficiency on the Nissan's lease, with the Nissan to be surrendered at the end of the lease; 2) $500.00 to Capital One; 3) $7,197.87 to MBNA; 4) $3,166.72 to Angela; and 4) $3,166.72 to Robert. The trial court then awarded to Robert the following: 1) $27,461.90 from his North American Stainless 401(k); 2) his life insurance policy; 3) his Ford truck; and 4) the balance in his checking account. To Angela, the trial court awarded the following: 1) $31,779.03 from Robert's 401(k); 2) the balance in her savings plan; 3) the balance in her pension plan; 4) her life insurance policy; and 5) the balance in her checking account. Thus, both Angela and Robert received a distribution in the amount of $49,977.66.

*DECISION*

When a party has requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Wenzel*

*v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 36 (Ind.Ct.App.2002), *trans. denied.* In reviewing the judgment, we first must determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Id.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* The judgment will be reversed if it is clearly erroneous. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id.* We will not reweigh the evidence or assess witness credibility. *Id.* Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's examination of the record leaves it with the firm conviction that a mistake has been made. *Id.*

### 1. *Judgment*

■ Robert contends the trial court erred in awarding Angela $487.82. During the hearing, Robert testified that after the parties separated he had made a payment on the car lease in January of 2004. Robert further testified that in March or April of 2004, he received a check from Fifth Third Bank. He "assumed that [he] had made the payment and [Angela] had made the same payment so they sent [his] back." (Tr. 62). The check was payable to Robert. Robert, however, acknowledged that Angela informed him that "she inadvertently made two lease payments on her car and that the bank had sent one back...." (Tr. 63).

Angela, however, did not present evidence that she made double payments on the lease or that Robert was obligated to make payments on the Nissan, driven exclusively by Angela after the parties' separation. The logical inferences to be drawn from the evidence and the parties' pattern of conduct are that Angela was to keep possession of the Nissan and make the lease payments thereon.

We cannot say that the evidence supports the trial court's award of $487.82 to Angela; therefore, the trial court erred when it ordered Robert to pay Angela $487.82. Accordingly, we reverse and remand with instructions to vacate the judgment against Robert and in favor of Angela.

### 2. *Prenuptial Agreement*

■ Robert asserts that "the trial court's failure to set over the appreciated values of the retirement savings plan and the whole life insurance policy to [him] in accordance with the prenuptial agreement was clearly erroneous." Robert's Br. 17. Robert also asserts the trial court erred in failing to award the UIU Pension and quad runner to him.

■ "Antenuptial agreements are legal contracts by which parties entering into a marriage attempt to settle their respective interests in the property of the other during the course of the marriage and upon its termination." *Magee v. Garry–Magee*, 833 N.E.2d 1083, 1087 (Ind.Ct.App.2005). Generally, antenuptial agreements are to be construed according to principles applicable to the construction of contracts. *Id.* "The interpretation of a contract is primarily a question of law for the court, even if the instrument contains an ambiguity needing resolution." *Id.* Accordingly, our standard of review is essentially the same as that applied by the trial court. *Id.*

■ "To interpret a contract, a court first considers the parties' intent as expressed in the language of the contract." *Schmidt v. Schmidt*, 812 N.E.2d 1074, 1080 (Ind.Ct.App.2004). "The court must read

all of the contractual provisions as a whole to accept an interpretation that harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered the contract." *Id.* If the terms of the contract are unambiguous, "the intent of the parties must be determined from the four corners of the document." *Id.* If the terms are ambiguous, "parol evidence is allowed in to clarify the ambiguity." *Magee*, 833 N.E.2d at 1087. "The terms of a contract are ambiguous only when reasonably intelligent persons would honestly differ as to the meaning of those terms." *Schmidt*, 812 N.E.2d at 1080.

Robert argues that, pursuant to the Prenuptial Agreement, he was entitled to any increase in the value of his 401(k) and insurance policy arising from earnings, appreciation or further investments. We agree.

The Prenuptial Agreement provides that the parties "desire to waive their respective rights to the property and estate of the other during their marriage and upon the termination of their marriage by death or dissolution." (App.15). The Prenuptial Agreement then identifies the property covered by the Prenuptial Agreement:

> [E]ach party agrees that Exhibits "A" and "B" attached to this prenuptial agreement set forth the descriptions, character, and fair market value of substantially all of their respective assets, liabilities and income.

(App.15).

As to any increase in the value of the each party's property, the Prenuptial Agreement states:

> [E]ach party recognizes that the property of the other may increase through

earnings, appreciate [sic], further investments, inheritances, and the like and is entering into this prenuptial agreement regardless of the value of such additions.

(App.15). Given this section, it is clear that the parties intended Robert's 401(k), including any growth due to contributions, to remain separate property. Thus, the trial court's finding that only "the balance in [Robert's] 401(K) account at the time of marriage ... is the separate property of Robert under terms of the Pre–Nuptial Agreement" is not supported by the evidence. (App.6). Accordingly, we find the trial court erred in awarding $31,779.03 from Robert's 401(k) to Angela. We therefore remand with instructions to enter a new property division decree that effectively sets aside the entirety of Robert's 401(k), his UIU Pension and the quad runner[3] to Robert and divides the marital property, including liabilities, in a just and reasonable manner in light of our holding.

Because the remaining issues regarding the division of marital assets and liabilities present concerns, which may arise upon remand, we address those in turn.

### 3. *Division of Proceeds*

Robert contends the trial court's division of the proceeds from the sale of the marital residence was in error. Specifically, Robert argues, "[t]he trial court abused its discretion in failing to apply the percentage contributions of each party to the acquisition of the sale proceeds and further abused its discretion in awarding the first $11,000.00 of those proceeds to [Angela] without explanation." Robert's Br. 20.

The division of marital assets is within the trial court's discretion, and we will reverse only for an abuse of discretion. *DeSalle v. Gentry*, 818 N.E.2d 40, 44 (Ind.Ct.App.2004). A party challenging

---

**3.** We note that, pursuant to the Prenuptial Agreement, Robert is entitled to receive the UIU Pension and the quad runner. The trial court, however, failed to address these items, and Angela does not dispute that Robert is entitled to these premarital assets.

the trial court's division of marital property must overcome a strong presumption that the trial court "considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal." *Id.* "We may not reweigh the evidence or assess the credibility of the witnesses, and we will consider only the evidence most favorable to the trial court's disposition of the marital property." *Id.*

■ "The division of marital property in Indiana is a two-step process." *Thompson v. Thompson*, 811 N.E.2d 888, 912 (Ind.Ct.App.2004), *trans. denied.* First, the trial court determines what property must be included in the marital estate. *Id.* "Included within the marital estate is all the property acquired by the joint effort of the parties." *Id.* Second, the trial court must then divide the marital property under the statutory presumption[4] that an equal division of marital property is just and reasonable. *Id.* The trial court, however, may deviate from this presumption. *Chase v. Chase*, 690 N.E.2d 753, 756 (Ind. Ct.App.1998).

### a. *Division of proceeds from the sale of the marital residence*

■ Robert asserts, "[a]n equal division of the proceeds from the sale of the marital house is not just or reasonable" because he contributed $28,000.00 toward the construction costs while Angela contributed $13,000.00. Robert's Br. 18.

■ The trial court may, in certain circumstances, set aside to one party the value of a marital asset where the other party did not contribute to its acquisition, but the court is not required to do so. *In re Marriage of Pulley*, 652 N.E.2d 528, 530 (Ind.Ct.App.1995), *trans. denied.* For example,

[a]n unequal division of marital property is justified where a party can demonstrate that certain marital property was acquired by one spouse prior to the marriage, that the other spouse made no contribution toward the acquisition of the property or the accumulation of the property, and the funds were never commingled with joint marital assets.

*Doyle*, 756 N.E.2d at 579.

In this case, Robert sold his properties and invested the proceeds in the marital residence; Angela invested her inheritance in the marital residence. The parties withdrew monies from a joint checking account, into which both parties made deposits, to make the mortgage payments.

4. Regarding the division of marital property, Indiana Code section 31–15–7–5 provides:

The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
(2) The extent to which the property was acquired by each spouse:
(A) before the marriage; or
(B) through inheritance or gift.
(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.
(5) The earnings or earning ability of the parties as related to:
(A) a final division of property; and
(B) a final determination of the property rights of the parties.

Given these facts, we cannot say that an unequal distribution of the proceeds in favor of Robert is warranted.

b. *Use of proceeds to pay credit card debt*

 Robert also contends the trial court erred in ordering that proceeds from the sale of the marital residence be used to pay a $500.00 debt owed on a credit card in Angela's name. As to the division of property, Indiana Code section 31–15–7–4 provides, in relevant part, as follows:

(a) In an action for dissolution of marriage under IC 31–15–2–2, the court shall divide the property of the parties, whether:

(1) owned by either spouse before the marriage;

(2) acquired by either spouse in his or her own right:

(A) after the marriage; and

(B) before final separation of the parties; or

(3) acquired by their joint efforts.

(b) The court shall divide the property in a just and reasonable manner....

Marital property includes both assets and liabilities. *Gard v. Gard*, 825 N.E.2d 907, 910 (Ind.Ct.App.2005). Thus, "[i]n making a division of marital property, the court properly considers the separate property rights of the parties as well as all debts of the parties." *White v. White*, 425 N.E.2d 726, 728 (Ind.Ct.App.1981). "Generally, the marital estate closes on the date the dissolution petition was filed, and debts incurred by one party after that point are not to be included in the marital estate." *Thompson*, 811 N.E.2d at 913.

Here, Robert filed the dissolution petition on February 10, 2004. At the hearing, Angela presented a credit card state-ment with an activity-closing date of February 19, 2004. The last transaction was made on February 3, 2004, and the ending balance was $459.15. Given that this debt arose prior to the filing of the dissolution petition, the trial court could properly include this liability in the marital estate.

c. *Use of proceeds to pay excess-mileage fee*

 Robert also argues that the trial court abused its discretion when it ordered that an excess mileage fee in the amount of $10,440.00 be paid from the home-sale's proceeds.[5] Here, Angela introduced an exhibit, illustrating the charges that would be incurred under the lease, which showed:

Lease term is 60 months—entered into 11–18–00.

12,000/year allowed, or 1,000/month, or 60,000 miles for lease term.

Excess wear and tear charge is 12¢ per mile in excess of 60,000 miles.

Actual mileage: 01–18–05 is 123,100[.]

Elapsed time: 50 months (November 18, 2000—January 24, 2005)[.]

Average mile/month-actual: 123,100 ÷ 50 = 2,462/miles per month.

10 more months @ 2,462 = 24,620[.]

Projected miles to end of lease—123,100 + 24,620 = 147,720[.]

Excess mileage: 87,000 (approximate)

Excess wear and tear charge: 87,000 × .12 per mile = $10,440.

(Ex. K). Robert did not present any evidence regarding the Nissan's actual or approximate monthly mileage.

The parties entered into the lease during the course of their marriage. Thus, any excess-mileage fee incurred prior to

5. The trial court ordered that the Nissan be surrendered at the end of its lease. Thus, the lessees, Angela and Robert, would incur an excess-mileage fee.

filing the dissolution petition should be included in, and paid from, the marital estate. Angela, however, maintained possession of the Nissan, and presumably, put additional miles on the Nissan subsequent to the filing of the dissolution petition. Because such "debt" arose after the petition was filed, Angela should be liable for those fees. Not all of the 60,000 allowable miles, however, should be credited toward the time of the marriage. Rather, they should be spread out over the entire period of the lease, with 1,000 miles allotted for each month of lease. Thus, using an approximate monthly mileage of 2,462, there were approximately 1,462 excess miles per month. For those excess miles incurred until the petition date, Angela and Robert would owe $7,193.04.[6] Thus, $7,193.04 incurred from excess miles should be included in the marital estate, with Angela being responsible for any additional fee.

4. *Asset Valuation*

 Robert asserts the trial court improperly valued his truck at $10,526.00. A trial court has broad discretion in ascertaining the value of property in a dissolution action. *Sanjari v. Sanjari,* 755 N.E.2d 1186, 1191 (Ind.Ct.App.2001). We will find no abuse of discretion if the trial court's decision is supported by sufficient evidence and reasonable inferences therefrom. *Id.*

Robert opined that his truck was worth $5,000.00. Without objection, the trial court admitted into evidence Angela's exhibit showing the truck to be worth between $6,286.00 and $10,526.[7] The trial court chose to value the truck at $10,526, which was within the range of values supported by the evidence. Thus, we find the trial court did not abuse its discretion in

determining that Angela's valuation was more accurate than Robert's. *See id.* at 1192.

Reversed and remanded for proceedings consistent with this opinion.

KIRSCH, C.J., and SULLIVAN, J., concur.

---

**6.** (1,462 excess miles per month × 41 months) × .12 = $7,193.04.

**7.** These figures represent the trade-in value and the dealer-retail value, respectively.