**MEMORANDUM DECISION**

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 09 2020, 10:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Jere L. Humphrey
Janette E. Surrisi
Plymouth, Indiana

ATTORNEYS FOR APPELLEE

George E. Horn, Jr.
Thomas M. Everett
South Bend, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lisa R. Carpenter, nka Ball, *Appellant-Petitioner,* | April 9, 2020 |
| | Court of Appeals Case No. 19A-DN-2512 |
| v. | Appeal from the Marshall Circuit Court |
| Jack L. Carpenter, *Appellee-Respondent* | The Honorable Curtis D. Palmer, Judge |
| | Trial Court Cause No. 50C01-1805-DN-80 |

**Altice, Judge.**

# Case Summary

Lisa R. Carpenter, nka Ball, (Ball) appeals from the trial court's distribution of marital property following the dissolution of her marriage to Jack L. Carpenter (Carpenter). Ball presents two issues for our review, which we divide and restate as:

> 1. Did the trial court deprive Ball of a fair proceeding in violation of her due process rights by not considering her proposed findings of fact and conclusions of law?

> 2. Did the trial court abuse its discretion in valuing the marital residence?

> 3. Did the trial court abuse its discretion in dividing the marital property?

We affirm in part, reverse in part, and remand with instructions.

# Facts & Procedural History

Carpenter lost his first wife in a tragic automobile accident on March 29, 1999. They had two children. Carpenter filed a wrongful death action that resulted in a $4.6 million settlement, which was awarded to Carpenter after he married Ball. Approximately half of the money was put in trust for his children.

Ball and Carpenter were married on August 5, 2000, and separated on or about May 9, 2018, when Ball filed a petition for dissolution of marriage. There were

no children born of the marriage, but they raised a blended family together.[1] During the marriage, Ball's parents gifted them an eight-acre parcel on which they built their marital home. Carpenter paid for the construction of the marital home, pool, and pole barn, at an estimated cost of $1 million, with money from the wrongful death settlement. Carpenter kept the remaining settlement funds in an account separate from other marital property.

[5] During the marriage, Carpenter paid for real estate taxes, homeowner's insurance, household furnishings, and family vacations. Ball paid for groceries, utilities, a housekeeper, and her own vehicle expenses. Ball testified that during their nearly eighteen-year marriage, they did things as a family and as a couple, raised their children, and had a marriage partnership, sharing in household duties and other intangibles associated with raising a blended family.

[6] The trial court held a final hearing on August 6, 2019. The parties submitted a stipulation to the court in which they "agree[d] on everything except the final division." *Transcript Vol. II* at 3. Ball testified that she was making no claim to $345,080 in wrongful death settlement funds Carpenter maintained in separate accounts. The hearing proceeded with the parties presenting their respective evidence as to the value of the marital home, personal property, and vehicles, as well as their positions as to the final division of marital property. At the

---

[1] In addition to Carpenter's two children, Ball has one child.

conclusion of the evidence, counsel for both parties agreed to reserve final arguments for their post-hearing submissions.

[7]     The chronological case summary (CCS) has a September 13, 2019 entry indicating that Carpenter submitted his proposed findings of fact and conclusions of law on September 12, 2019. Although the CCS indicates that Ball submitted her findings of fact and conclusions of law on September 12, 2019, such was not noted on the CCS until September 30, 2019. The trial court entered the Decree of Dissolution on September 26, 2019 and divided the marital assets. As pertinent to the issues presented herein, the court made the following findings:

> 7. The parties are the joint owners of an eight-acre parcel of real estate where the marital residence, pool and associated outbuildings are located. This ground was obtained as a gift from [Ball]'s parents shortly after the parties were married.
>
> * * *
>
> 9. All of the improvements to the property were paid for by [Carpenter] from funds he obtained following the settlement of a civil claim resulting from an automobile accident in which his first wife was killed.
>
> 10. The civil claim arose before the parties were married, but the settlement of approximately $4.6 Million was received after they were married. Regardless of the timing, those funds (less any money put in trust for [Carpenter]'s two minor sons) became marital property.

11. During the eighteen-year marriage, the parties maintained separate bank accounts and the wrongful death settlement funds were never commingled with [Ball]'s funds.

* * *

17. During the marriage, [Carpenter] paid for the construction and furnishings for the marital home, pool, pool house, pole barn, etc. He also paid for all family vacations, all real estate taxes and all homeowner's insurance.

* * *

29. The contributions of each spouse to the acquisition and improvement of the marital real estate are not equal. Although the ground was gifted to the parties from [Ball]'s parents, the overwhelming majority of the current value of the marital real estate stems from the wrongful death settlement funds used for construction of the improvements to the real estate.

30. The real estate is the single largest asset to be divided by the court.

31. The court finds the wrongful death settlement funds paid to [Carpenter] to be similar in kind to property obtained by one spouse through inheritance or gift as referred to in IC § 31-15-7-5(2)(B)

*Appellant's Appendix Vol. II* at 9-10. The trial court determined that the presumption of an equal distribution had been rebutted and awarded eighty percent of the identified marital assets to Carpenter and twenty percent to Ball. Ball now appeals. Additional facts will be provided as necessary.

# Discussion & Decision

## *1. Due Process*

Ball argues that the trial court deprived her of a fair proceeding in violation of her due process rights. Specifically, Ball argues that because the trial court had the benefit of Carpenter's proposed findings of fact and conclusions of law but not hers, she was deprived "of an even playing field and a fair proceeding." *Appellant's Brief* at 11.

The Fourteenth Amendment of the United States Constitution prohibits any state from depriving a person of life, liberty, or property without due process of law. The due course of law provision of the Indiana Constitution provides that "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Indiana courts have consistently construed Article I, Section 12 of the Indiana Constitution as analogous to the federal due process clause. *See, e.g.*, *Doe v. O'Connor*, 790 N.E.2d 985, 988 (Ind. 2003); *see also McIntosh v. Melroe Co.*, 729 N.E.2d 972, 976 (Ind. 2000). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Ball's argument is based solely on the fact that her post-hearing submission was not entered on the CCS until after the trial court entered its judgment. The CCS, however, is simply a sequential order of all judicial events in any given proceeding. Ind. Trial Rule 77(B) provides, in pertinent part:

> Notation of judicial events in the CCS shall be made promptly, and shall set forth the date of the event and briefly define any documents, orders, rulings, or judgments filed or entered in the case. *The date of every notation in the CCS should be the date the notation is made, regardless of the date the judicial event occurred.*

(Emphasis supplied). Thus, under T.R. 77(B), the date of the entry in the CCS does not represent the date a document was filed. Rather, the CCS is a subsequent record created by the clerk that sets forth and describes documents that have been filed.

Ball has not shown that the trial court did not have the benefit of her proposed findings and conclusions. Although not entered on the CCS until after the trial court issued its judgment, the CCS entry specifically states that Ball's post-hearing submission was "Submitted: 09/12/2019."[2] *Appellant's Appendix Vol. II* at 6. Contrary to Ball's claim, the delayed entry on the CCS is not evidence that "the court didn't have the benefit of [Ball]'s written argument prior to ruling." *Appellant's Brief* at 11. Ball has not pointed to any other evidence that suggests the trial court did not consider her filing. Because the CCS entry date was the basis of her due process claim, such claim fails.

### 2. Valuation of Marital Residence

As an initial matter, we note that the dissolution court entered special findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). Accordingly,

---

[2] We remind the trial court that filings with the court should be file-stamped to avoid problems such as this.

our standard of review is two-tiered: first, we determine whether the evidence supports the findings and, second, whether the findings support the judgment. *Marion Cnty. Auditor v. Sawmill Creek, LLC*, 964 N.E.2d 213, 216 (Ind. 2012). We view the evidence in the light most favorable to the judgment and defer to the court's findings if they are supported by the evidence or any legitimate inferences flowing therefrom. *Id.* at 216-17. Legal conclusions, on the other hand, are reviewed de novo. *Id.* at 217.

[13] Ball challenges the trial court's valuation of the marital residence.[3] The trial court's valuation of marital assets is within its sound discretion and will only be disturbed for an abuse of discretion. *Morey v. Morey*, 49 N.E.3d 1065, 1069 (Ind. Ct. App. 2016) (citing *In re Marriage of Nickels*, 834 N.E.2d 1091, 1095 (Ind. Ct. App. 2005)). As long as the evidence is sufficient and reasonable inferences support the valuation, an abuse of discretion does not occur. *Id.* We will not reweigh the evidence and will consider the evidence in the light most favorable to the judgment. *Id.* "Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court." *Nickels*, 834 N.E.2d at 1095 (quoting *Bizik v. Bizik*, 753 N.E.2d 762, 766 (Ind. Ct. App. 2001), *trans. denied*).

[14] The trial court noted that Ball's appraisal valued the marital residence, including the pole barn, at $675,000 and that Carpenter's appraisal valued the

---

[3] The marital residence includes the eight-acre parcel of land, the home, the pool, and associated outbuildings.

marital residence at $565,000, but such did not include the pole barn. The court also noted that, consistent with the testimony of the parties, the pole barn cost $70,000 to construct. Without further explanation the trial court determined the "fair value for the real estate (including the pole barn) to be $625,000." *Appellant's Appendix Vol. II* at 11. Ball suggests that the trial court arrived at this number by using Carpenter's appraisal of $565,000 and adding $70,000 for the pole barn, which she correctly observes adds up to $635,000, not $625,000. Ball argues that the trial court abused its discretion because the math does not add up and there is no other evidence to support the court's calculation. We disagree.

The evidence before the court was that it cost between $60,000 and $70,000 to construct the pole barn. The evidence also established that historical construction costs were greater than the current market value. Indeed, the parties agreed that construction of the martial residence cost nearly one million dollars, but that its current value was much less. Thus, the value of the pole barn was likely less than the cost to construct it. The court's valuation of the marital residence, including the pole barn, at $625,000 was within the evidence presented by the parties. We find no abuse of discretion.

### 3. *Property Division*

Ball also argues that the trial court abused its discretion in dividing the marital property. Like the valuation of marital property, the disposition of marital assets is within the dissolution court's sound discretion, and we will reverse only for an abuse of that discretion. *Eye v. Eye*, 849 N.E.2d 698, 701 (Ind. Ct.

App. 2006). We consider only the evidence most favorable to the dissolution court's decision, without reweighing the evidence or assessing the credibility of witnesses. *Id*.

[17] Pursuant to Ind. Code § 31-15-7-5, the dissolution court is required to divide the marital estate in a just and reasonable manner. An equal division is presumed just and reasonable, but a party may rebut this presumption by presenting evidence that an equitable division would not be just and reasonable, including evidence concerning the following pertinent factors:

> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
>> (A) before the marriage; or
>>
>> (B) through inheritance or gift.
>
> * * *
>
> (5) The earnings or earning ability of the parties as related to:
>
>> (A) a final division of property; and
>>
>> (B) a final determination of the property rights of the parties.

*Id*. The term "just" invokes a concept of fairness and of not doing wrong to either party; it does not necessarily mean equal or relatively equal. *Doyle v. Doyle*, 756 N.E.2d 576, 578 (Ind. Ct. App. 2001).

[18] A party challenging the dissolution court's division of marital property must overcome a strong presumption that the dissolution court "'considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal.'" *McCord v. McCord*, 852 N.E.2d 35, 43 (Ind. Ct. App. 2006) (quoting *DeSalle v. Gentry*, 818 N.E.2d 40, 44 (Ind. Ct. App. 2004)), *trans. denied*. Accordingly, we will reverse a property distribution only if there is no rational basis for the award, and although the circumstances may have justified a different property distribution, we may not substitute our judgment for that of the dissolution court. *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind. Ct. App. 2004).

[19] Here, the trial court divided the property unequally with a purported 80-20 split that was actually even greater of a split. Although the trial court found that Carpenter's wrongful death settlement was marital property, it did not include the $345,080 in settlement funds that were set off to Carpenter in its 80-20 division of martial assets. As this court has before stated, "for the sake of clarity, it's the best practice to include inherited property in final marital pot calculations, instead of setting them off, in order to more accurately reflect the actual division of marital property." *Maxwell v. Maxwell*, 850 N.E.2d 969 (Ind. Ct. App. 2006). Had the trial court properly included the funds as part of the marital pot and then set such off to Carpenter before dividing the remaining

assets with an 80-20 split, the actual division of property would have been closer to an 86-14 split in favor of Carpenter.

[20] Ball does not disagree that the separate settlement funds should be set off to Carpenter, resulting in a greater distribution to him. Ball argues, however, that the trial court treated the home improperly. Here, the trial court justified the 80-20 split because Carpenter used settlement funds to pay for construction of the marital residence and the settlement funds were akin to an inheritance or gift.

[21] Ball argues that settlement funds Carpenter used to pay for construction of the marital residence that they lived in for nearly all of the seventeen-plus-year marriage are not of the same character as the settlement funds Carpenter kept in separate accounts. Specifically, Ball argues that the funds became commingled marital property, thereby negating the trial court's justification for an 80-20 split. Ball argues that the trial court abused its discretion by awarding Carpenter the majority of the value of the marital residence. Carpenter asserts that because he paid for the construction of the marital residence, the settlement funds are traceable to its current value and thus should be set off to him, which he maintains, justifies the court's property division.

[22] The concept of traceability arose in *Keller v. Keller*, 639 N.E.2d 372 (Ind. Ct. App. 1994), *trans. denied*. In that case, the majority upheld an unequal distribution of marital property in favor of wife where wife inherited a home in her name only during the marriage, subsequently sold the home and deposited

the proceeds into a joint account, and then used the proceeds toward the purchase of a second marital home. The majority approved of the trial court using "'traceability' as a tool to determine the extent to which some of the marital property was acquired through inheritance." *Id*. at 374. Judge Staton dissented, opining that acquisition of property by inheritance "does not, without more, satisfy the statutory criteria that a deviation from the presumed 50/50 split is appropriate." *Id*. at 375. He pointed out that the parties lived in the home wife inherited for six years, jointly contributed to the maintenance of the home and used joint funds to pay the mortgage during that time, deposited the proceeds from the sale of the home into a joint account, and used the proceeds to purchase a second marital residence. *Id*. Because the parties commingled all their assets and efforts, Judge Staton would have reversed and remanded for an equal distribution of marital assets. *Id*.

[23]     Eleven years later, a majority in *Hatten v. Hatten*, 825 N.E.2d 791 (Ind. Ct. App. 2005) (Baker, J. dissenting), *trans. denied*, disagreed with the *Keller* holding, stating that "the mere fact of traceability of assets should not be the basis for deviation from the presumptive equal division." *Id*. at 796. The *Hatten* majority acknowledged that husband had received an inheritance and that he initially put the money into an account in his name only. The majority noted, however, that wife's name was later added to the account and that for nearly fifteen years of the parties' marriage, the account was used to pay for marital expenses such as home improvements, an automobile, and travel and living expenses. The majority held that considering this commingling of funds over

the course of the marriage, the trial court abused its discretion in awarding the entire value of the account to husband on the basis that the proceeds therein were "directly traceable to Husband's inheritance." *Id*. at 793.

[24] At issue here is how the court treated the settlement funds used to pay for the marital home. We agree with the *Hatten* majority that "the mere fact of traceability of assets should not be the basis for deviation from the presumptive equal division." *Id*. at 796. Carpenter used a million dollars of the settlement to pay for construction of the marital residence that he and Ball lived in and raised their blended family for almost all of their nearly eighteen-year marriage. As evidenced by the following exchange, even Carpenter believed that the marital home was marital property that they shared equally. During the final hearing, the following exchange occurred:

> Q And at that time, before the house was built, you would have thought the house was equally yours and equally hers, wouldn't you?
>
> A Yes.
>
> Q Do you have any hesitation on that?
>
> A No, the house is definitely, you know, was ours. Um – I would contest that I used my money to build it; so, part of me thinks it's my sons and mine because the money came from the death of my wife and their mother.

*Transcript Vol. II* at 32.

Based on the forgoing, we conclude that the settlement funds Carpenter used to pay for construction of the marital residence lost their identity as settlement funds and became commingled marital property. Our conclusion in this regard negates the trial court's justification for awarding its unequal distribution of martial assets, especially where Carpenter received settlement funds in addition to eighty percent of the other marital assets, including the marital home. Aside from improperly tracing Carpenter's settlement funds to the marital residence, there is no other justification for awarding Carpenter eighty percent of the home's value. In sum, we hold that the disparity in the distribution of marital property is clearly against the logic and effect of the facts and circumstances before the court. We remand to the trial court to recalculate division of marital property in accordance with this decision.

Judgment affirmed in part, reversed in part, and remanded.


Bailey, J. and Crone, J., concur.