

FILED

Nov 20 2025, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Tejinder Aulakh,

*Appellant-Petitioner*

and

Mohinder Aulakh, Harbhajan Aulakh, Northlake Investment LLC,
and Greenhill Investment LLC,

*Appellants-Third-Party Defendants*

v.

Navneet Aulakh,

*Appellee-Respondent*

---

November 20, 2025

Court of Appeals Case No.
24A-DC-3027

Appeal from the Hendricks Superior Court

The Honorable Robert W. Freese, Special Judge

---

**Opinion by Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Judge.**

## Case Summary

[1] In this contentious proceeding, Tejinder Aulakh ("Husband") appeals the division of property and child support award in the dissolution of his marriage to Navneet Aulakh ("Wife"). Husband's parents, Mohinder Aulakh ("Husband's Father") and Harbhajan Aulakh ("Husband's Mother") (collectively, "Parents"), along with Northlake Investment, LLC ("Northlake"), and Greenhill Investment, LLC ("Greenhill") (collectively, "Joined Parties"), who were joined in the dissolution action to answer for marital assets transferred to them, also appeal.

[2] The trial court concluded that Husband fraudulently transferred marital assets to his Parents, who then transferred assets to Northlake and Greenhill, and the trial court included the fraudulently transferred assets in the marital estate. The trial court then awarded Wife fifty-eight percent of the marital estate. Northlake and Greenhill challenge the denial of their motion for summary judgment regarding the transferred assets, and Husband challenges the trial court's findings regarding the inclusion of fraudulently transferred assets in the

marital estate; the inclusion of other assets in the marital estate; the valuation of certain marital assets; the division of the marital estate; the calculation of child support and the child support arrearage; and the trial court's order on proceedings supplemental. Finding no clear error, we affirm.

## Issues

The Joined Parties appeal and raise one issue, which we restate as whether the trial court erred by denying Northlake's and Greenhill's motion for summary judgment regarding the inclusion of their accounts in the marital estate. Husband appeals and raises several issues, which we reorder, consolidate, and restate as:

    I.    Whether the trial court erred in determining the assets to be included in the marital estate.

    II.    Whether the trial court erred when valuing certain marital assets.

    III.    Whether the trial court abused its discretion by awarding fifty-eight percent of the marital estate to Wife.

    IV.    Whether the trial court abused its discretion in its determination of Husband's child support obligation and child support arrearage.

## Facts

Husband and Wife married in December 2012, and have one child, G.A. ("Child"), who was born in January 2017. Husband is a software engineer,

who has worked for various technology companies, and Wife is a dentist. Through his employment, Husband generally is paid a substantial salary plus restricted stock units ("RSU").[1]

[5] The couple initially lived in California in a home that was purchased by Husband with his Mother, but they moved to Indiana in 2016. For much of the marriage, Husband's Parents lived with Husband and Wife. Husband's Father was a high school teacher before he owned a taxicab company. Husband's Mother was also a teacher briefly, but she resigned to raise their children. Prior to 2016, Husband's Parents' income was approximately $50,000 per year, but their income fell to less than $6,000 per year by 2018. Neither of Husband's Parents had 401(k) accounts or retirement funds.

[6] Two weeks after Child's birth, Husband was arrested for a domestic violence incident against Wife. Wife filed a petition for dissolution of marriage in April 2017. Husband and Wife, however, reconciled, and Wife dismissed the petition in May 2017.

[7] After the dismissal of Wife's first dissolution petition, Husband began transferring significant marital assets to his Parents. In 2017, Husband purchased two rental homes in Indianapolis and transferred ownership of the homes to his Mother. In 2018, Husband transferred ownership of the

---

[1] "A restricted stock unit (RSU) is an award of stock shares, usually given as a form of employee compensation." Investopedia, Restricted Stock Unit (RSU): How It Works and Pros and Cons [https://perma.cc/Q6ED-Z84L] (last visited Nov. 3, 2025).

California residence to his Parents, and Husband paid the remaining mortgage balance of $300,000. Husband also transferred hundreds of thousands of dollars in investment stocks to his Mother. In 2019, Husband's Parents' income increased to $112,880; their income was $192,684 in 2020, and $281,920 in 2021.[2]

[8] In April 2021, Husband filed a petition for dissolution of marriage. On July 1, 2021, the trial court provisionally ordered Husband to pay $1,220 per week in child support. Wife then filed a cross-petition for dissolution of marriage in January 2022.

[9] Husband and his Parents were generally uncooperative with Wife's efforts to obtain discovery during the dissolution proceedings. Wife deposed Husband and his Mother on February 22, 2022, but they failed to bring documents responsive to a subpoena *duces tecum*; Husband's Mother refused to answer questions; Husband's Father left before being placed under oath and questioned; and Husband's Father shouted at Wife's counsel. Wife then filed a motion to join Husband's Parents as necessary parties in the dissolution action because she believed that "Husband [had] transferred valuable assets to his [P]arents in an effort to prevent [the trial court] from including them in the marital estate." Appellants' App. Vol. II p. 84. Wife alleged that she was a creditor as defined by the Uniform Fraudulent Transfer Act ("UFTA").

---

[2] Mother and Father had apparently not yet filed their 2022 and 2023 tax returns.

[10]     Husband filed a petition to modify his provisional child support order, and in July 2022, the trial court entered an amended provisional order requiring Husband to pay weekly child support of $176 and to pay Wife 7.4% of any RSU that he receives.

[11]     In August 2022, Husband's Father formed Greenhill as a single member LLC in Wyoming. He then transferred hundreds of thousands of dollars into a Greenhill account. Also in August 2022, Husband's Mother formed Northlake as a single member LLC in Wyoming. Northlake then opened a Merrill Edge account, and she transferred more than $200,000 in cash and later more than $2.7 million in cash and securities into the account. In 2023, Husband's Father transferred hundreds of thousands of dollars from a Greenhill account to a bank account in India, and he purchased properties in India.

[12]     The trial court held a hearing in October 2022 to address Wife's request to join Husband's Parents as necessary parties, but the trial court recessed the hearing and later issued the following order:

> Not long after the proceedings commenced, the Court was required to take a recess because of disruptive behavior by [Husband's Father]. Specifically, the Court observed [Husband's Father] stand up in the gallery and gesture with his hands to get the Court's attention, thereafter he engaged verbally with counsel, began making loud sounds and/or speaking loudly, and further made inappropriate comments directed towards [Wife] in Punjabi. Prior to the Court being able to address the matter through direct contempt, courthouse deputies had to engage with [Husband's Father] and eventually an ambulance had to be called. Thereafter, [Husband's Father] was removed from the

courthouse and taken to the hospital. The Court recessed the proceedings so that Husband could transport his mother to the hospital and be with his father.

Appellants' App. Vol. II pp. 128-29.

[13] The trial court rescheduled the proceedings for November 29, 2022. After that hearing, the trial court granted Wife's motion to join Husband's Parents as necessary parties pursuant to Indiana Trial Rule 19(A). The trial court found that Husband's Parents were not "credible witnesses" and "[t]heir testimony was often evasive, contradictory, and inconsistent." *Id.* at 131.

[14] The trial court further granted Wife's motions for rule to show cause against Husband's Parents due to their "repeated pattern of attempting to avoid answering reasonable discovery questions." *Id.* They were ordered to pay $10,000 of Wife's attorney fees, and Husband was ordered to pay $10,000 of Wife's attorney fees because his motions lacked merit, caused a delay of the proceedings, and caused a substantial increase in attorney fees. The trial court found Husband "wholly lacking credibility as to many issues . . . ." *Id.*

[15] In March 2023, Wife filed a petition for rule to show cause regarding Husband's Parents' failure to respond to discovery requests. At some point, Husband's Parents fled the United States to India, although they later returned. In May 2023, the trial court found them in contempt and imposed a thirty-day jail sentence, which it stayed pending receipt of the discovery responses. Wife later alleged that Husband's Parents failed to comply, and the trial court ordered them to report to jail but again stayed the sentence pending a hearing.

Following the hearing, the trial court ordered both to comply with the discovery requests by August 17, 2023, which they did. They also then submitted to depositions.

[16] In September 2023, Wife requested that the trial court freeze Northlake's Merrill Edge account without notice to Husband or his Parents, which the trial court granted. After a hearing in October 2023, the trial court ordered that Northlake's Merrill Edge account would continue to be frozen.

[17] In February 2024, Wife sought to join Northlake, Greenhill, and Redwood Properties, LLC, as necessary parties. After a hearing, on March 11, 2024, the trial court granted Wife's motion as to Northlake and Greenhill but denied the motion as to Redwood Properties, LLC. The trial court found:

> 4. Since the provisional hearing, this has been a very contentious and heavily litigated case, with multiple motions and hearings. The consistent theme and issue throughout this process has been allegations that Husband and his parents have engaged in improper transfers for the purpose of keeping assets from the marital estate.
>
> * * * * *
>
> 7. [Husband's Mother] formed Northlake Investment, LLC, as a single member LLC in the State of Wyoming. Based upon [her] history of testimony in this case, including in-court and through discovery depositions, the Court finds her organization, membership, and individual participation in Northlake Investment, LLC, dubious at best. Her entire history of testimony in this case has been a denial of knowledge and lack of understanding regarding the parties' financial transactions.

8. Interestingly, the Court notes that Northlake Investment, LLC, was formed on August 26, 2022, just 20 days prior to a scheduled hearing on September 15, 2022, to determine whether [Husband's Mother] should be added as a party.

9. On September 14, 2022, the Court re-set the hearing on Wife's Motion to Join Parties to October 4, 2022. Five (5) days before the hearing, on September 30, 2022, [Husband's Mother] transferred $2,736,800 from her account to Northlake Investment, LLC.

* * * * *

11. [Husband's Parents] have a history in this case of giving testimony that this Court found to be evasive, contradictory, and inconsistent. They have routinely and repeatedly resisted efforts at full and transparent discovery related to their financial accounts.

12. On February 21, 2023, Greenhill Investment, LLC, received $400,000 into its Bank of America account, from an account identified as BRK ***4 via a bank transfer.

13. On February 27, 2023, Greenhill Investment, LLC, received $225,000 into its Bank of America account, from an account identified as BRK ***4 via a bank transfer.

14. Between February 21, 2023, and February 27, 2023, Mohinder "Singh" sent wire transfers totaling $410,000 to what appears to be a bank in India.

15. On March 10, 2023, Greenhill Investment, LLC, received $105,000 into its Bank of America account from an account identified as BRK ***4 via a bank transfer.

16. [Husband's Parents] have not identified the BRK ***4 in any way in discovery.

17. Between March 7, 2023, and March 14, 2023, [Husband's Father] received $767,500 from an unknown account and deposited the same into the Bank of America account. Between March 8, 2023, and March 14, 2023, [he] transferred $770,000 to an account at Punj AB National Bank.

18. The Bank of America account [Husband's Father] used to transfer $770,000 is a different Bank of America account than the Greenhill Investment, LLC, account.

19. [Husband] has a history of transferring investments to [his Mother]. Between December 29, 2017, and July 20, 2020, he transferred $882,459 in investments to her.

20. Historically, [Husband's Parents] have reported annual investment income of about $40,000.

*Id.* at 155-58.

[18]     In March 2024, Northlake and Greenhill filed a motion to dismiss and a motion for relief from the orders freezing their accounts based upon a lack of personal jurisdiction, which the trial court denied.[3] Northlake and Greenhill filed a motion for summary judgment regarding Wife's claims of fraudulent transfer of marital assets in July 2024. Northlake and Greenhill argued that none of their

---

[3] Northlake and Greenhill then filed a motion to certify the order for interlocutory appeal, but the trial court denied the motion.

assets should be included in the marital estate. Northlake and Greenhill claimed that: (1) none of the assets at issue were transferred from Husband or Wife to Greenhill or Northlake; and (2) the trial court did not have jurisdiction over Greenhill or Northlake. Wife filed a response to the motion for summary judgment with designated evidence. After a hearing, the trial court found that it had jurisdiction and denied Northlake's and Greenhill's motion for summary judgment.

[19] The trial court held a final hearing over several days in November 2024. Multiple accounting experts testified, including Penny Lutocka for Wife. On December 9, 2024, the trial court granted the decree of dissolution of marriage and entered findings of fact and conclusions thereon. The trial court concluded that Husband fraudulently transferred marital assets to Husband's Parents as follows:

> 12. Between the date of domestic violence in January 2017 and the filing of Husband's petition in April 2021, Husband began acting on his plan to divest Wife of marital assets by purchasing and transferring assets without Wife's knowledge or consent using marital funds/assets, which include:
>
> > a. In 2017: Husband purchased the properties located at 1617 N Luett Ave, Indianapolis, IN 46222 and 2712 S. Moreland Ave, Indianapolis, IN 46241.
> >
> > b. December 29th, 2017: Husband executed two Quitclaim Deeds transferring both 2712 S Moreland Ave Indianapolis, IN 46241 and 1617 N Luett Ave, Indianapolis, IN 46222 to [his Mother].

c. On December 29th, 2017, Husband transferred stock investments (Apple, Facebook, Altaba and Netflix) with an aggregate value of $470,375 to [his Mother].

d. January 10th, 2018: Husband transferred investment stock (Facebook) with an aggregate value of $56,352 to [his Mother].

e. January 26th, 2018: Husband transferred investment stock (Salesforce) with an aggregate value of $264,239 to [his Mother].

f. January 29th, 2018: a Quitclaim Deed is executed in Alameda County, California transferring 149 Galway Terrace property from [Husband] to [his Mother].

g. February 9th, 2018: [Husband] transferred investment stocks (Bank of America, Netflix, Salesforce and Tesla) with an aggregate value of $76,717 to [his Mother].

h. July 20th, 2020: Husband transferred Twitter stock valued at $14,776 to [his Mother].

* * * * *

44. Lutocka's testimony supports multiple badges of fraud as established under Indiana case law.

45. Lutocka's testimony regarding [Husband's Parents'] paltry income, their earnings statements and tax returns, lack of f-bar filings with their income tax returns, coupled with [Husband's Mother's] uncontroverted testimony that in the decade prior to 2017 she and her husband had a combined income of less than $50,000 per year all while contending with the high cost of living

in the state of California, that [Husband's Parents'] claims that the funds and real estate transferred to them by their son were really their money, leads the Court to conclude that neither [Husband's Mother] nor [his Father] had the requisite funds to build the wealth they currently enjoy.

46. Husband's claims that he transferred this enormous wealth to his parents because they paid his way through college, because they gave him money to invest for them, and because he was merely paying them back for caring for his son, is wholly lacking credibility.

47. Husband's testimony throughout under direct testimony and cross-examination testimony was unpersuasive, evasive and often contradicted by his own parents' testimony under oath. Husband claimed that he had not seen his parents' tax returns, yet [Husband's Father] testified that his son often assisted him with his taxes. Husband testified that his parents were handling everything financially, yet [Husband's Father] stated repeatedly under oath that Husband has managed all his financial accounts and would continue to do so. Further contradicting Husband's testimony that his parents were handling their own financial affairs, evidence was presented of lengthy email strings with mortgage companies from [Husband's Mother's] Gmail account, yet Husband appeared to be negotiating and supplying all information with the mortgage lenders. Finally, Husband admitted to giving contrary reasons under oath for transfers of Twitter stock to his mother in 2020.

* * * * *

57. The "losses" to the marital estate as found in Lutocka's report were all supported by the evidence and represent fraudulent transfers by Husband to his parents.

Appellants' App. Vol. V pp. 161-62; 169-70, 172.

[20]     The trial court determined the value of the marital estate to be $5,874,333. Given Husband's behavior, the trial court found that a deviation from the presumption of an equal division of the marital estate was warranted. The trial court ordered that Wife receive fifty-eight percent of the marital estate and ordered that Husband make an equalization payment of $3,263,821.14. Specifically, the trial court ordered:

> Given Husband's behavior since the dismissal of Wife's Dissolution action in 2017, the Court appoints William Harrington as Commissioner to sign all documents on behalf of [Husband's Mother]/Northlake Investment, LLC for the Northlake Merrill Edge account ending in *71Y58 so that Merrill Edge shall issue a check made payable to Wife in the amount of $3,407,113.14 plus $1,500 for Mr. Harrington's fees.

Id. at 188. The trial court also ordered Husband to pay Wife's attorney fees and deposition costs.

[21]     Husband and the Joined Parties sought to stay execution of the judgment pending appeal, and the trial court ordered a $250,000 payment to Wife out of the Northlake Merrill Edge account with the remainder of the account to remain frozen pending appeal. Husband failed to make the required payments, and Wife instituted proceedings supplemental.[4] The trial court then ordered the

---

[4] Additionally, Husband failed to make child support payments, and Wife filed a motion for rule to show cause. After a hearing, the trial court ordered Husband to pay the following:

    a. $36,706.49 to [Wife] for the support judgment awarded on December 9, 2024.

Commissioner to issue a check to Wife in the amount of $676,982.14 from the Northlake Merrill Edge account, with the rest of the funds in the account to remain frozen pending appeal. Husband and the Joined Parties now appeal.

## Discussion and Decision

[22] Husband and the Joined Parties appeal and raise several issues regarding the division of property in the dissolution action, along with an issue regarding the trial court's child support order. The trial court issued findings of fact and conclusions thereon pursuant to a request under Indiana Trial Rule 52(A). Accordingly, we apply a two-tiered review. *Wysocki v. Johnson*, 18 N.E.3d 600, 603 (Ind. 2014). We "affirm when the evidence supports the findings, and when the findings support the judgment." *Id.* We do not "set aside the findings or judgment unless [they are] clearly erroneous," and we must give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* (citing Ind. Trial Rule 52(A)). "Findings of fact are clearly erroneous only when they have no factual support in the record." *Id.* "[A] judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Id.* at

---

    b. Judgment interest of $1,596.84.

    c. An additional child support arrearage of $1,736.

    d. $2,150 to [Wife] pursuant to his support obligation of 8.6% of irregular income received for his January bonus of $25,000.

    e. [Husband] shall pay 8.6% of the gross amount of his March 8, 2025 restricted stock that he receives. The child support portion of the Court's December 9, 2024 Findings of Fact and Conclusions of Law are not stayed.

    f. $1,000 in attorney fees.

Appellants' App. Vol. V p. 226.

604.  We review the trial court's legal conclusions de novo.  *Gittings v. Deal*, 109 N.E.3d 963, 970 (Ind. 2018).

[23]  We also note that:

> there is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *In re Marriage of Richardson*, 622 N.E.2d 178 (Ind. 1993). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)).  "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Id*.

*Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).

## I.  Determination of the Marital Estate

[24]  We first address the arguments of Husband and the Joined Parties regarding the determination of the marital estate.  "'It is well settled that in a dissolution action, all marital property goes into the marital pot for division, whether it was owned by either spouse before the marriage, acquired by either spouse after the marriage and before final separation of the parties, or acquired by their joint efforts.'" *Meyer v. East*, 205 N.E.3d 1066, 1071 (Ind. Ct. App. 2023) (quoting *Falatovics v. Falatovics*, 15 N.E.3d 108, 110 (Ind. Ct. App. 2014)).  Specifically, Indiana Code Section 31-15-7-4(a) provides:

In an action for dissolution of marriage under IC 31-15-2-2, the court shall divide the property of the parties, whether:

(1) owned by either spouse before the marriage;

(2) acquired by either spouse in his or her own right:

(A) after the marriage; and

(B) before final separation of the parties; or

(3) acquired by their joint efforts.

For purposes of dissolution, property means "all the assets of either party or both parties." Ind. Code § 31-9-2-98. "Marital property includes both assets and liabilities." *Meyer*, 205 N.E.3d at 1072 (quoting *McCord v. McCord*, 852 N.E.2d 35, 45 (Ind. Ct. App. 2006), *trans. denied*).

[25] "'The requirement that all marital assets be placed in the marital pot is meant to insure [sic] that the trial court first determines that value before endeavoring to divide property.'" *Id.* (quoting *Falatovics*, 15 N.E.3d at 110). "'Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award.'" *Id.* (quoting *Falatovics*, 15 N.E.3d at 110).

[26] Wife argued below that Husband fraudulently transferred marital assets to his parents and raised claims against Husband and the Joined Parties under Indiana Code Section 32-18-2-14(a) of the UFTA, which provides:

A transfer made or an obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>> (B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

[27] "A creditor who seeks to have a transfer set aside as fraudulent under [the] UFTA bears the burden of proving that such transfer was made with fraudulent intent." *Hernandez-Velazquez v. Hernandez*, 136 N.E.3d 1130, 1137 (Ind. Ct. App. 2019) (citing *Greenfield v. Arden Seven Penn Partners, L.P.*, 757 N.E.2d 699, 703 (Ind. Ct. App. 2001), *trans. denied*). "The question of fraudulent intent is a question of fact." *Id.* "Lack of consideration alone is not enough to support a charge of fraud." *Id.* "Rather, fraudulent intent may be inferred from various factors or 'badges of fraud' present in a given transaction." *Id.* at 1137-38.

[28] "As no single indicium constitutes a showing of fraudulent intent per se, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent." *Id.* at 1138. "Indiana's UFTA has codified these 'badges of fraud.'" *Id.* Under the UFTA, to determine the debtor's intent, the trial court may consider, among other factors, whether:

> (1) the debtor retained possession or control of the property transferred after the transfer;

> (2) the transfer or obligation was disclosed or concealed;

> (3) before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

> (4) the transfer was of substantially all the debtor's assets;

> (5) the debtor absconded;

> (6) the debtor removed or concealed assets;

> (7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

> (8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and

> (9) the transfer occurred shortly before or shortly after a substantial debt was incurred.

I.C. § 32-18-2-14(b). Wife had the burden of proving the elements of a claim for relief under the UFTA "by a preponderance of the evidence." I.C. § 32-18-2-14(c).

## A. Northlake's and Greenhill's Motion for Summary Judgment

[29] We begin by addressing Northlake's and Greenhill's argument that the trial court erred by denying their motion for summary judgment. "We review summary judgment decisions de novo, and Trial Rule 56(C) supplies the framework." *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 684 (Ind. 2024). "The moving party is entitled to summary judgment only if the evidence it designates in support of its motion 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 684-85 (quoting Ind. Trial Rule 56(C)). The purpose of summary judgment is to withdraw issues from the jury only when there are no genuine factual issues for the jury to decide. *Id.* at 685. "Summary judgment is available when the nonmovant cannot prove its claim based on the undisputed evidence[.]" *Id.*

[30] The summary judgment movant has the burden of making a *prima facie* showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Burton v. Benner*, 140 N.E.3d 848, 851 (Ind. 2020). The burden then shifts to the non-moving party, which must then show the existence of a genuine issue of material fact. *Id.* On appellate review, we resolve "[a]ny doubt as to any facts or inferences to be drawn therefrom . . . in favor of the non-moving party." *Id.* "We limit our review to the materials

designated at the trial level." *Gunderson v. State, Ind. Dep't of Nat. Res.*, 90 N.E.3d 1171, 1175 (Ind. 2018).

[31] Northlake and Greenhill argue that the trial court erred by denying their motion for summary judgment because the designated evidence failed to connect the funds deposited into the Northlake and Greenhill accounts to marital assets. Wife's designated evidence demonstrated that Husband transferred hundreds of thousands of dollars in stocks and funds to his Mother. Shortly before the hearing to add Husband's Parents as parties to this litigation, Husband's Parents formed Northlake and Greenhill. Husband's Mother, in turn, transferred stocks and cash to Northlake. Further, hundreds of thousands of dollars were transferred into Greenhill's accounts, which were later transferred to a bank in India. Husband's Parents did not have the historical income to possess millions of dollars in such assets, and Husband retained control over his Parents' accounts.

[32] The Joined Parties argue that there must be a "direct link" between the funds and assets transferred by Husband to his Parents to the assets transferred by his Parents to Northlake and Greenhill. Joined Parties' Appellants' Br. p. 27. It is unnecessary, however, for Wife to establish that the exact investments and funds transferred from Husband to his Parents were the exact investments and funds transferred by them to Northlake and Greenhill. Multiple badges of fraud are evident from the designated evidence. Wife needed only to demonstrate genuine issues of material fact as to her UFTA claims, and she did so. We

conclude that the trial court properly denied Northlake's and Greenhill's motion for summary judgment.

## B.  Husband's Fraudulent Transfers

[33]  Husband argues that the trial court's finding that "Husband engaged in a fraudulent scheme to divest Wife of marital assets is not supported by the record."  Husband's Appellant's Br. p. 21.  Husband argues that the funds and investments that he transferred to his Parents actually belonged to his Parents and he was merely investing the funds for them; that Husband merely returned his Parents' funds to them; and that Wife failed to demonstrate a plan to defraud the marital estate.

[34]  Husband's argument, however, is merely a request that we reweigh the evidence and judge the credibility of the witnesses, which we cannot do.  The trial court heard undisputed evidence that Husband's Parents generally had income of less than $50,000 per year, and Husband worked as a software engineer, earning a substantial salary and RSUs.  Following Wife's dismissal of the 2017 dissolution proceeding, Husband transferred significant marital assets out of the marital estate.  Husband and his Parents did not cooperate with discovery during these proceedings, and Wife was forced to hire a forensic accountant to identify marital assets.  The forensic accountant testified that Husband transferred hundreds of thousands of dollars in investments, funds, and properties to his Mother.  Those assets significantly appreciated both before and during these dissolution proceedings.  Even after the transfers, Husband retained control over these assets.  The forensic accountant identified multiple

badges of fraud under the circumstances, and the trial court specifically did not find Husband or his Parents to be credible witnesses. Given the presence of multiple badges of fraud, the trial court's findings regarding Wife's UFTA claims are not clearly erroneous.[5]

## C. Rents from the Amber Lane property

[35] Next, Husband challenges the trial court's inclusion of "post-filing rents from [his Mother's Amber Lane] property to the marital estate . . . ."[6] Husband's Appellant's Br. p. 38. The trial court found:

> The Court does not find that the Amber Lane property was an asset of the marriage. However, the Court did hear uncontroverted evidence that it was purchased with funds provided in the transfers of wealth from Husband to [his Mother], therefore the rents that [his Mother] receives on that property are a marital asset through the date of the final hearing in this matter, and thereafter, income to Husband.

---

[5] Husband also argues that the trial court improperly treated Northlake and Greenhill assets as marital assets and failed to make any findings necessary to pierce the corporate veil. Husband's arguments regarding piercing the corporate veil are misplaced. Regarding piercing the corporate veil, this Court has held:

> Generally, a shareholder is not personally liable for the acts of the corporation. While an Indiana court will impose personal liability to protect innocent third parties from fraud or injustice, the burden is on the party seeking to pierce the corporate veil to prove that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice. When a corporation is functioning as an alter ego or a mere instrumentality of an individual or another corporation, it may be appropriate to disregard the corporate form and pierce the veil.

*Brummett v. Bailey*, 223 N.E.3d 1162, 1166 (Ind. Ct. App. 2023) (internal citations and quotations omitted). Here, Wife was not attempting to hold the "shareholders" of Northlake and Greenhill liable for acts of the corporations. Rather, Wife was attempting to void fraudulent transfers pursuant to the UFTA.

[6] Husband also argues that the trial court erred by including the rents as his income for purposes of child support, which we address with the other child support arguments in this opinion.

Appellants' App. Vol. V p. 171. The trial court then included $178,828, which included estimated rents from the Amber Lane property as well as the other rental properties, as a marital asset.

[36] The evidence showed that, during the dissolution proceedings, Husband's Mother purchased property on Amber Lane in Indianapolis in September 2021 using funds that Husband had earlier transferred to her. She later transferred title to the property to an LLC that she and Husband's Father controlled.

[37] The forensic accountant, Lutocka, testified regarding the assets she located that should be included in the marital estate. Lutocka testified that she did not include the Amber Lane property as a marital asset because she had already included the funds used to purchase the property as marital assets and when determining the entire marital estate. If the Amber Lane property was included as a marital asset, Lutocka concluded that she would be "double counting." Tr. Vol. V p. 144. Lutocka, however, did include "rents that were being received on this rental property as a loss to the marital estate" because those rents would have been income to the marriage. *Id.*

[38] Lutocka estimated the "lost" cash flow from the marital estate for the four rental properties, which included the Amber Lane property, between 2021 and September 30, 2024, as $178,828. Thus, the trial court included only lost rents incurred during the pendency of the dissolution as part of the marital estate; the trial court did not include "future" rents in the marital estate contrary to Husband's argument. We have held that rental income derived from marital

property and accrued during dissolution proceedings is also marital property. *See Smith v. Smith*, 854 N.E.2d 1, 7 (Ind. Ct. App. 2006). Given Husband's transfer of funds to Husband's Mother, who used the funds to purchase a rental property, we cannot say the trial court abused its discretion by including estimated rents during the dissolution proceedings in the marital estate.

### D. Salesforce 401(k)

Next, Husband argues that the trial court abused its discretion by including a Salesforce 401(k), with a value of $77,020, as a marital asset. Husband, however, argues that no evidence demonstrates that the account: (1) still existed; and (2) the balance, if any, at the time of filing. Husband argues that the documentation of the Salesforce 401(k) was from 2013. The exhibit regarding the Salesforce 401(k) refers to "Statement Period: 01/01/2013 to 12/31/2013," but also refers to "Contribution Elections as of . . . 06/21/2020" and "Additional Fund Information As of 06/21/2020." Ex. Vol. IX pp. 111-13. Accordingly, the document does not appear to be from 2013, as Husband argues. Under these circumstances, we cannot say the trial court abused its discretion by including $77,020 as a marital asset.

## II. Valuation Date of Investment Accounts

Next, Husband argues that the trial court erred when valuing certain investment accounts. A trial court has "broad discretion in ascertaining the value of property in a dissolution action, and we will not disturb its valuation absent an abuse of that discretion." *Omije v. Whilby-Omije*, 256 N.E.3d 539, 545 (Ind. Ct.

App. 2025), *trans. denied*. On appeal, we will not reweigh the evidence, and we consider the evidence in the light most favorable to the trial court's decision. *Id.* During a dissolution proceeding, when determining the date upon which to value the marital assets, the trial court may select any date between the date of filing the dissolution petition and the date of the final hearing. *Id.* (citing *Webb v. Schleutker*, 891 N.E.2d 1144, 1151 (Ind. Ct. App. 2008)). "If the trial court's valuation is within the scope of the evidence, the result is not clearly against the logic and effect of the facts and reasonable inferences before the court." *Meyer*, 205 N.E.3d at 1073 (citing *Webb*, 891 N.E.2d at 1151).

[41] Husband argues that the trial court abused its discretion when valuing the Charles Schwab account, which the trial court valued at $227,457 based upon a 2021 valuation. Husband contends that the value of the account had dropped to $34,562.72 by the time of the trial due to the decreased value of Lyft stock. On the other hand, according to Husband, the trial court valued a Fidelity Rollover IRA at $397,739 based upon a 2021 valuation, but the account had increased in value by approximately $10,000 at the time of the trial. Finally, Northlake's Merrill Edge account was valued at $710,679 in 2022, but the trial court used the trial date valuation, which was substantially higher. According to Husband, the trial court's "approach materially distorted the true value of the marital estate." Husband's Appellant's Br. pp. 36-37.

[42] In support of his argument, Husband relies upon *McGrath v. McGrath*, 948 N.E.2d 1185, 1188 (Ind. Ct. App. 2011), in which this Court held it "'is possible for a court to abuse its discretion in picking a [valuation] date which unjustly

fails to account for' a significant change in an asset's value during the proceedings." (quoting *Knotts v. Knotts,* 693 N.E.2d 962, 969 (Ind. Ct. App. 1998), *trans. denied*). In *McGrath*, we noted that the real estate at issue was a substantial part of the marital estate, the husband did not cause the decline in value, and the change in value caused a "significant departure from an equal division of the marital estate." *Id.* at 1188-89.

[43] Wife, however, relies upon *Trabucco v. Trabucco*, 944 N.E.2d 544 (Ind. Ct. App. 2011), *trans. denied*. There, the value of an investment account was over $300,000 at the time of filing, and the value was $97,470 at the time of the final hearing. The trial court used the valuation at the time of filing in its calculations. On appeal, the husband argued "that the trial court's chosen valuation date was an abuse of discretion because it unjustly failed to account for a significant decrease in the value" of the account. *Trabucco*, 944 N.E.2d at 559. We declined to find an abuse of discretion in the trial court's valuation especially given the husband's "control over the account." *Id.* at 560.

[44] Similarly, here, Husband was in control over these accounts, and Husband's conduct significantly delayed these proceedings, creating the opportunity for values of the accounts to change dramatically. Further, the Northlake account did not exist when the dissolution proceedings were filed, but marital funds transferred by Husband to his Mother were used to open the account. Under these circumstances, we cannot say the trial court abused its discretion when it chose the valuation date of the Charles Schwab account.

## III. Division of the Marital Estate

[45] Next, Husband argues that the trial court abused its discretion by ordering an unequal division of the marital estate. Pursuant to Indiana Code Section 31-15-7-4(b), the trial court "shall divide the property in a just and reasonable manner . . . ." We "presume that an equal division of the marital property between the parties is just and reasonable." Ind. Code § 31-15-7-5.

> However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
>
> (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>
> (2) The extent to which the property was acquired by each spouse:
>
> (A) before the marriage; or
>
> (B) through inheritance or gift.
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.
>
> (4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

> (A) a final division of property; and

> (B) a final determination of the property rights of the parties.

*Id.*

[46] The trial court here found that a deviation from the presumption of an equal division was warranted. Specifically, the trial court found:

> 99. [ ] A deviation is supported in Wife's favor when considering Husband's financial and litigious orchestrations to divest the marital [e]state since the date the petition was filed. This is fair and reasonable given the cost she's bor[n]e over years of litigation with Petitioner, Third-Party Defendants and their single member LLCs: Northlake Investment, LLC and Greenhill Investment, LLC.

> 100. Also supporting the deviation in Wife's favor, it is unlikely that all of Husband's fraudulent transfers were captured during the investigative process of this divorce, thereby depriving this Court of its mandate to divide all marital assets and debts. Wife was prevented from ascertaining the source of the $770,000 [Husband's Father] transferred to India, and the increase thereto. The $882,459 that Husband transferred to [his Mother] increased in value to approximately $4 million dollars by the time this matter was finally concluded, and it is not unreasonable to assume that the $770,000 [Husband's Father] transferred overseas would have had gains as well, but Wife was never provided any information on the source of those funds, much less any appreciation thereto.

101. Finally, the Court must consider "the conduct of the parties during the marriage as related to the disposition or dissipation of their property" in assessing the need for deviation. Husband's conduct and that of his [P]arents has been the most egregious conduct this Court has witnessed, and their conduct has caused significant loss to the marital estate. The Court concludes that the marital estate is just over $5.8 million, despite Husband's Marital Balance Sheet at trial indicating a marital estate of under $700,000. Wife has had to endure [in]numerable delays, unnecessary and costly discovery battles, assistance from multiple other professionals and experts in this protracted litigation with the common denominator being Husband.

\* \* \* \* \*

109. The Court finds that based on the evidence, statutes, and case law, Wife is entitled to 58% of the marital estate as set forth on EXHIBIT A attached hereto.

Appellants' App. Vol. V pp. 186-88.

[47] Husband argues that the trial court's order amounted to a "double penalty" because the trial court both imputed the assets held by the Joined Parties and ordered a deviation from the presumption of an equal division. Husband's Appellant's Br. p. 32. To the contrary, the trial court was statutorily required to consider the "conduct of the parties during the marriage as related to the disposition or dissipation of their property." I.C. § 31-15-7-5. Dissipation "includes the concealment and misuse of marital property." *Goodman v. Goodman*, 94 N.E.3d 733, 743 (Ind. Ct. App. 2018), *trans. denied*. The trial court found that the conduct of Husband and his parents was "the most egregious

conduct this Court has witnessed." Appellants' App. Vol. V p. 187. This Court agrees. Husband systematically transferred funds and property to his parents to remove the assets from the marital estate. Experts were unable to trace all of the assets, and some assets were transferred to accounts in India. Under these circumstances, the trial court's deviation from the presumption of an equal division was not an abuse of discretion. *See, e.g.*, *Goodman*, 94 N.E.3d at 744 ("Considering the evidence most favorable to the trial court's division of marital property, and the wealth of evidence that Husband was less than forthcoming about his income, we conclude that Wife rebutted the presumption of an equal division of marital assets and a deviation from an equal split was warranted.").

## IV. Child Support

[48] Next, Husband argues that the trial court erred in calculating child support. "[A] trial court's calculation of child support is presumptively valid." *Bogner v. Bogner*, 29 N.E.3d 733, 738 (Ind. 2015) (quoting *Young v. Young,* 891 N.E.2d 1045, 1047 (Ind. 2008)). We consider "only evidence and reasonable inferences favorable to the judgment," and we reverse only if the determination is "clearly erroneous." *Id.* Clear error is error that "leaves us with a definite and firm conviction that a mistake has been made." *Masters v. Masters*, 43 N.E.3d 570, 575 (Ind. 2015).

### A. Husband's Income

[49] Husband argues that the trial court abused its discretion by treating future rents as income to Husband. Accountant Kenneth Stalcup testified that Husband

included rental income on his tax returns until 2017, when the income "shifted" to his parents' tax returns. Tr. Vol. III p. 129. Stalcup, thus, included the "estimated net annual cash flows from the rental properties" when calculating Husband's estimated weekly potential income. *Id.* Stalcup estimated that the annual cash flow from the four rental properties was $65,001; Wife used this amount in her calculation of Husband's estimated weekly income of $4,544; and the trial court used Wife's calculation in its findings and in determining Husband's child support obligation. Indiana Child Support Guideline 3(A)(2) allows rents to be included in the calculation of weekly gross income. Accordingly, we cannot say the trial court abused its discretion by including the estimated rental income when calculating Husband's weekly income for child support purposes.

### B. Wife's Income

[50] Husband argues that the trial court clearly erred in determining Wife's income for child support purposes. The trial court found that Wife stipulated to a weekly gross income of $2,647 for child support purposes, even though her actual income was less. Appellants' App. Vol. V p. 182. Husband contends that more income should be imputed to Wife.

[51] Indiana Child Support Guideline 3(a)(3) provides: "If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income." "[D]iscretion must be exercised on an individual case basis to determine if it is fair under the circumstances to attribute potential income to a particular

nonworking or underemployed custodial parent. The need for a custodial parent to contribute to the financial support of a child must be carefully balanced against the need for the parent's full-time presence in the home." Commentary 2(c)(1) to Ind. Child Support Guideline 3A.

[52] Wife testified that she currently works three days a week. Her employer only has three days available for Wife to work, and another dentist works the other two days. Wife testified that the schedule "gives me a flexibility in schedule to be a present and effective single parent for my son who's an only child." Tr. Vol. V p. 176. Wife is still working and earning a substantial income while caring for Child. Under these circumstances, the trial court's calculation of Wife's income was not clearly erroneous. *See, e.g.*, *Castaneda v. Castaneda*, 615 N.E.2d 467, 471 (Ind. Ct. App. 1993) (finding no basis to conclude that the wife was underemployed for child support purposes where she worked part-time to care for the children).

## C. Overpayment of Child Support

[53] Next, Husband argues that the trial court failed to account for his overpayment of child support. The trial court concluded that Husband had a child support arrearage of $33,006.49. Husband, however, claims that he had an overpayment of child support of $63,223.18.

[54] In 2021, Husband was employed by Lyft, and his June 2021 Lyft earnings statement listed a gross pay of $533,827.13 for the first six months of the year. The earnings included a year-to-date salary of $105,980.83 and year-to-date

RSU earnings of $427,846.41. Based upon this income, the trial court calculated for the initial provisional order in July 2021 that Husband owed $1,220 per week in child support. Husband later requested a modification of his provisional child support, and the trial court reduced Husband's child support to $176 per week as of July 20, 2022. As part of Husband's child support modification, the trial court also required Husband to pay 7.4% of his RSU earnings to Wife.

[55]   Husband seems to be arguing that the initial provisional order was based on an erroneous income, resulting in an overpayment of child support. The initial provisional child support order, however, was supported by the evidence, and Husband has failed to demonstrate that the initial provisional order was clearly erroneous. Moreover, the trial court did not make the July 2022 modification of child support retroactive. Under these circumstances, we cannot say that Husband established an overpayment of child support.[7]

## Conclusion

[56]   The trial court properly denied the motion for summary judgment filed by Northlake and Greenhill. Further, Husband has failed to demonstrate that the trial court's conclusions regarding the contents of the marital estate, valuation

---

[7] Husband also argues that the trial court's liquidation of $676,982.14 from the Northlake account during proceedings supplemental was erroneous because an appeal was pending and the transfer left no remedy if the judgment was reversed. Given our affirmance of the trial court's determination and division of the marital estate, we need not address this argument.

of marital assets, division of the marital estate, or child support are clearly erroneous. Accordingly, we affirm.

[57] Affirmed.

Bailey, J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT-TEJINDER AULAKH

Bryan L. Ciyou
Ciyou & Associates, P.C.
Indianapolis, Indiana

Anne M. Lowe
Fugate Gangstad Lowe, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLANTS-MOHINDER AULAKH, HARBHAJAN AULAKH, NORTHLAKE INVESTMENT LLC, AND GREENHILL INVESTMENT LLC

William N. Riley
Russell B. Cate
Sundeep Singh
RileyCate, LLC
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Brian K. Zoeller
Gabriel A. Hawkins
Michael W. McBride
Julie M. Andrews
Cohen & Malad, LLP
Indianapolis, Indiana